997 A.2d 828

STATE of Maryland

v.

Helen L. HOLTON.

No. 861, Sept. Term, 2009.

Court of Special Appeals of Maryland.

July 1, 2010.

Thomas M. McDonough, Deputy State Prosecutor & Robert A. Rohrbaugh of Townson, MD, for appellant.

Joshua R. Treem & Nicholas J. Vitek (Schulman, Treem, Kaminkow & Gilden, on the brief) Baltimore, MD, for appellee.

Panel: DAVIS, WOODWARD, ALAN M. WILNER, (Retired, Specially Assigned), JJ.

DAVIS, J.

Appellant, the State of Maryland, appeals from the dismissal of charges against Baltimore City Councilperson Helen L. Holton, appellee. Appellee was indicted by a Baltimore City grand jury and charged with bribery, malfeasance in office, nonfeasance in office and perjury, arising out of her involvement with a development project in the Harbor East area of Baltimore City. Appellee moved to dismiss all of the charges on the basis that the evidence introduced before the grand jury constituted legislative acts, barred by the common law legislative privilege. The court addressed appellee's motion to dismiss together with a "nearly identical" motion filed by former Baltimore City Mayor, Sheila Ann Dixon, in a separate case. The court ruled in favor of both Dixon and appellee. The State now appeals that ruling as it pertains to appellee and presents one question for our review:

> Did the trial court err in holding that legislative immunity protects legislators in subordinate political subdivisions from criminal prosecution from the State?

For the reasons that follow, we answer the State's question in the negative. Accordingly, we affirm.

## FACTUAL BACKGROUND

The trial court dismissed the charges against appellant on the grounds that the only evidence obtained by the State, and alleged in the indictment, involved legislative acts. The charges related to a payment of $12,500 made by Doracon Contracting, Inc. (Doracon), a developer owned in-part by Ronald Lipscomb, for a political survey for appellee's benefit. The State alleged that the payment was intended to influence appellee to vote in favor of public subsidies known as "payments in lieu of taxes" (PILOT) for the development of two parcels of land in Baltimore City, for the benefit of Doracon and Lipscomb.

The State presented evidence to the grand jury in the form of records and testimony regarding the proceedings of the Baltimore City Council and appellee's activities in her capacity as a member of the Economic Development and Public Financing Committee and as Chairperson of the Taxation and Finance Committee, including telephone calls and meetings with Lipscomb and Doracon representatives. The circuit court provided the following summary of the legislative acts which it concluded infected the counts in the indictment against appellee:

> In Defendant Holton's case, the use of legislative material is apparent in a review of the indictment. It recites that Defendant Holton is and has been a duly elected member of the Baltimore City Council. ¶ 7. It notes that she was Chairperson of the Economic Development and Public Financing Subcommittee, and that after January 2007, she served as the Chairperson of the Taxation and Finance Subcommittee. At that time, she additionally served as chairperson of the Taxation and Finance Subcommittee. ¶¶ 8 and 9. The indictment describes the efforts of Ronald Lipscomb to communicate with Defendant Holton in her capacity as a member of the Baltimore City Council, and then as the chairperson of the Taxation and Finance Committee, regarding those projects. ¶ 11–21.

More specifically, the indictment alleges that beginning on or about June 4, 2007, Bill 07–0700 relating to Parcel D was introduced to the City Council and assigned to Ms. Holton's Committee. ¶¶ 22 and 23. Shortly thereafter, Ms. Holton commissioned an election survey to be prepared for her. ¶ 25. Eventually, Doracon Contracting Inc. paid $12,500.00 to Company Z for the survey. ¶ 31. Subsequently, Ms. Holton received the results of the survey, and thereafter, in the City Council, reported Bill 07–0700 favorably to the City Council on behalf of her committee and later voted for the bill in the City Council. ¶ 33–36.

Legislative material pertaining to Defendant Holton is specifically referenced in many counts of the indictment. For example:

¶ 15. On or about June 12, 2006, at the regularly scheduled 3:00 p.m. meeting of the Baltimore City Council, Councilwoman Helen L. Holton, acting for the Economic Development and Public Financing Subcommittee, reported favorably to the City Council on Bill 05–0301, the proposed PILOT for Parcel B portion of the Inner Harbor East project.

¶ 17. On or about July 10, 2006, Bill 05–301, the proposed PILOT for the Parcel B portion of the Inner Harbor East project was authorized by the City Council with Councilwoman Helen L. Holton abstaining.

¶ 28. On or about July 19, 2007, the Taxation and Finance Committee of the Baltimore City Council held a public hearing on Bill 07–0700. Of the five members of the Committee, Chairperson Helen L. Holton and two other committee members voted to report favorably on the Bill with amendments. One member was absent and the fifth member abstained.

¶ 34. On or about August 13, 2007, Helen L. Holton reported Bill 07–0700 favorably with amendments to the City Council.

¶ 36. On or about September 24, 2007, the City Council approved Bill 07–0700 authorizing tax relief benefits in the form of a Payment in Lieu of Taxes (PILOT) for

Parcel D of Inner Harbor East with Councilwoman Helen
L. Holton casting her vote in favor of the Bill.

These legislative acts are realleged in each of the four
counts of the indictment. They form the factual predicate
for the charge in Count 1 that the payment by Doracon
Contracting Inc. of $12,500.00 for the survey constituted the
receipt of the bribe. ¶ 40; in Count II, that the alleged
solicitation and acceptance of that same money constituted a
gift and malfeasance in office. ¶ .42; in Count III, that the
failure to list the receipt of the $12,500.00 gift on Ms.
Holton's 2007 Financial Disclosure Form constituted perju-
ry, ¶ .42; and in Count IV, that this failure also constituted
nonfeasance in office. ¶ .46.

In sum, the indictment alleged that appellee received and
failed to report on her Financial Disclosure Statement the
payment by Lipscomb's company for her survey, the *quid pro
quo* in exchange for the following acts: she reported favorably
on the floor of the City Council on a bill that would subsidize
parking for one of the development projects at issue, but
abstained from voting on the matter; appellee participated in
meetings between December 2005 and July 2007 with Lips-
comb and others to negotiate the terms of another lot, which
was ultimately approved by the Baltimore City Board of
Estimates and she favorably reported another bill in favor of
the second parcel, then voted in favor of the bill, which was
ultimately approved by the City Council. The Indictment
ultimately alleged that she signed, under oath, her Financial
Disclosure Statement and filed it, without disclosing the afore-
said payment, acts constituting perjury, nonfeasance and mal-
feasance in office.

The trial court dismissed the indictment and issued a memo-
randum opinion delineating its reasons. The court rejected
the State's argument that local legislators are only entitled to
legislative immunity in civil cases. Citing *Montgomery Coun-
ty v. Schooley,* 97 Md.App. 107, 627 A.2d 69 (1993), the court
determined that appellee, a local legislator, was entitled to the
protections of common law legislative immunity, which the
trial court believed to be "co-extensive" with the immunity

afforded to State legislators through the Speech and Debate provision of the Maryland Constitution. The circuit court distinguished the case principally relied upon by the State, *United States v. Gillock,* 445 U.S. 360, 100 S.Ct. 1185, 63 L.Ed.2d 454 (1980), which holds that a state legislator is not protected by a state legislative privilege in a federal criminal prosecution, because "such a state-created privilege was not part of the federal common law, and its recognition in federal court was not compelled by principles of federalism." Because appellee invoked a state privilege in a state criminal prosecution, the court determined that, "[i]f the legislative immunity doctrine is indeed co-extensive with [the Speech and Debate clause], it is hard to see why the legislative immunity doctrine would not have purchase to some degree to promote the public purposes behind the doctrine when a State criminal prosecution is mounted."

The court further determined that the acts alleged in the indictments constituted legislative acts and that the State made "no fall-back or alternative argument that its conduct of the prosecution could be shown to have complied with the State and federal law...." Thus, the court opined:

> The Court reads the failure of the State prosecutor to make such a showing or proffer, despite being provided several opportunities to do so, including at oral argument on the motion on April 23rd, as a functional concession and admission that, on the current record, it cannot show compliance with the requirements to screen the grand jury from prohibited and prejudicial legislative related evidence in either of these cases.

Because it was not clear to the court that the grand jury would have indicted appellee without the evidence emanating from legislative proceedings, the trial court dismissed the indictment against Councilperson Holton.

The State noted a timely appeal, challenging the court's determination that appellee's legislative acts were shielded by common law legislative immunity. After oral argument, this Court, *sua sponte,* directed the parties to address the applicability and impact of Md.Code (2006 Rep. Vol., 2009 Supp.),

Courts and Judicial Proceedings, C.J.P. § 5–501, which was not raised by either party before the trial court or in their briefs to this Court, and to reconcile how, if the statute was intended to immunize local legislators from prosecution for bribery, the General Assembly could, by statute, immunize a class of officers covered by Article III, Section 50 of the Maryland Constitution. Additionally, this Court directed counsel to address the issue, based upon *County Council v. Investors Funding Corp.*, 270 Md. 403, 436, 312 A.2d 225 (1973) and *Barranca v. Prince George's County*, 264 Md. 562, 570–71, 287 A.2d 286 (1972), whether the traditional rationale for immunity of state legislators based on separation of powers is applicable to a local government and its officials.[1] The parties filed supplemental briefs in response to the Court's instructions. We shall address in this opinion the original question raised on appeal as well as the issues addressed in the supplemental memoranda.[2]

## STANDARD OF REVIEW

The trial court determined, as a matter of law, that the charges in the indictment against appellee, based upon evi-

---

1. The Court of Appeals has previously acknowledged that, on certain occasions, it is both necessary and appropriate for an appellate court to raise and address an issue not previously presented by the parties in order to resolve the legal question before it. In *Master Financial v. Crowder*, 409 Md. 51, 57 n. 1, 972 A.2d 864 (2009), the Court opined:

   For good reason, it is rare that the Court will add an issue not raised by the parties in either the lower courts or this Court. As we observed in *Robinson v. Bunch*, 367 Md. 432, 440, 788 A.2d 636, 641–42 (2002), however, "in circumstances where we have determined that the proper resolution of a case requires our consideration of certain matters not dealt with by the parties, we have, by order, added issues that were neither presented in certiorari petitions and cross-petitions nor raised in the courts below." *See also County Council v. Dutcher*, 365 Md. 399, 405, 780 A.2d 1137, 1140 (2001).

2. To the extent that the statute provides a protection similar or *in pari materia* to that afforded by the common law, the question of its scope and application does not constitute a new issue but merely an alternative theory or argument for sustaining the ruling of the circuit court. *See Crown Oil & Wax Co. of Del. v. Glenn Const. Co. of Va.*, 320 Md. 546, 561, 578 A.2d 1184 (1990).

dence of her legislative acts, were barred by the common law doctrine of legislative immunity. The court's ruling was based upon a pure question of law; thus, we shall review its decision *de novo.*

> [The Court of Appeals has said] that "[b]ecause [its] interpretation of the Maryland Declaration of Rights and Constitution, provisions of the Maryland Code, and the Maryland Rules are appropriately classified as questions of law, [it] review[s] the issues *de novo* to determine if the trial court was legally correct in its rulings on these matters." *Davis v. Slater,* 383 Md. 599, 604, 861 A.2d 78, 80–81 (2004); *see also Schisler v. State,* 394 Md. 519, 535, 907 A.2d 175, 184 (2006) ("where an order involves an interpretation and application of Maryland constitutional, statutory or case law, our Court must determine whether the trial court's conclusions are 'legally correct' under a *de novo* standard of review"). Thus, because we are presented with legal questions . . ., we consider them *de novo.*

*Owens v. State,* 399 Md. 388, 402–03, 924 A.2d 1072 (2007).

## LEGAL ANALYSIS

We are tasked on this appeal with a determination of only the issue presented to the trial judge and decided by him, *i.e.,* whether the prosecution of a local legislator may be based on evidence of his or her legislative acts. We underscore that our ultimate decision in no way intimates that local legislators are shielded from criminal prosecution when acting outside the purview of the legislative function. Based on existing statutory and decisional law, which we shall address in greater detail, *infra,* it is beyond cavil that local legislators are answerable for violations of the criminal laws committed outside the narrow parameters we recognize herein. Lest there be any doubt, we now make indelibly clear that the issue before this Court is not, and never has been, whether appellee or any member of a local legislature may be criminally prosecuted for bribery, but only whether such a prosecution may be founded upon and proved by evidence of words spoken or actions taken by the legislator acting in his or her legislative capacity.

The principle that legislators are absolutely immune from liability for their legislative activities has long been recognized in Anglo–American law. This privilege "has taproots in the Parliamentary struggles of the Sixteenth and Seventeenth Centuries" and was "taken as a matter of course by those who severed the Colonies from the Crown and founded our Nation." *Tenney v. Brandhove,* 341 U.S. 367, 372, 71 S.Ct. 783, 95 L.Ed. 1019 (1951). The Federal Constitution, the constitutions of many of the newly independent States, and the common law thus protected legislators from liability for their legislative activities. *See* U.S. Const., Art. I, § 6; *Tenney v. Brandhove, supra,* 341 U.S. 367 at 372–375 [71 S.Ct. 783].

*Bogan v. Scott–Harris,* 523 U.S. 44, 48–49, 118 S.Ct. 966, 140 L.Ed.2d 79 (1998).

In both the trial court and in the parties' briefs submitted to this Court, the issue was framed only in the context of whether Maryland common law, as enunciated in *Schooley, supra* and *Manders,* 101 Md.App. 191, 643 A.2d 931 (1994), provides the same protections to local legislators that the State constitutional speech and debate provisions provide to State legislators. Accordingly, in the case *sub judice,* we must determine whether a local legislator, although not expressly covered by the speech and debate provisions of the Maryland Constitution or the United States Constitution, may invoke the common law doctrine of legislative privilege in Maryland in a *criminal* prosecution, which is currently an open question in Maryland. We hold that the common law privilege applies to local legislators in state criminal prosecutions. In addition, we hold that the same protection is embodied in C.J.P. § 5–501.

# I

The State devotes a significant portion of its brief advancing its argument that appellee, a local legislator, was not entitled to legislative immunity under the Speech and Debate clause of the Maryland Constitution. Appellee does not dispute this

position and, in fact, the trial court's ruling was not based on this proposition.

In *Blondes v. State,* 16 Md.App. 165, 294 A.2d 661 (1972), we interpreted the Speech and Debate provision of the Maryland Constitution. Blondes, a delegate in the State legislature, was indicted for bribery. *Id.* at 167, 294 A.2d 661. He moved to dismiss the indictment because

> ... the prosecution was predicated upon legislative activities performed by him while a member of the Legislature, [and] he was afforded constitutional immunity from trial in a court of law by reason of the Speech and Debate clauses contained in Article 10 of the Maryland Declaration of Rights and Section 18 of Article 13 of the Maryland Constitution....

*Id.* The trial court denied the motion to dismiss and Blondes appealed. We agreed with Blondes and reversed the court's decision.

Article 10 of the Maryland Declaration of Rights provides: "That freedom of speech and debate, or proceedings in the Legislature, ought not to be impeached in any Court of Judicature." [3] Section 18 of Article 3 of the Maryland Constitution provides: "No Senator or Delegate shall be liable in any civil action, or criminal prosecution, whatever, for words spoken in debate."

Addressing the origin of these clauses, we opined:

> The immunity of legislators from prosecution by the executive and judicial branches of government for the performance of legislative acts evolved from the long struggle in England for parliamentary supremacy and first found written form in the English Bill of Rights of 1689: "That the Freedom of Speech, and Debates or Proceedings in Parliament, ought not to be impeached or questioned in any Court or Place out of Parliament." 1 W. & M., Sess. 2, c. 2. As adopted in Section 6 of Article I of the Constitution of

---

**3.** Unlike its federal counterpart, the constituents of the Maryland Speech and Debate Clause are stated in the conjunctive.

the United States, and the Constitutions of the various states, including Maryland, the legislative privilege afforded by speech and debate clauses has served both to protect the integrity of the legislative process by insuring the independence of individual legislators and to reinforce the separation of powers embodied in our tripartite form of government. *United States v. Johnson, supra.*

*Blondes,* 16 Md.App. at 174–75, 294 A.2d 661.

Quoting *United States v. Johnson,* 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966), we observed that legislative immunity was

born to prevent intimidation by the executive and accountability before a possibly hostile judiciary; that "the instigation of criminal charges against critical or disfavored legislators by the executive in a judicial forum was the chief fear prompting the long struggle for parliamentary privilege in England and, in the context of the American system of separation of powers, is the predominate thrust of the Speech or Debate Clause." 383 U.S. at 182 [86 S.Ct. 749].

*Blondes,* 16 Md.App. at 175, 294 A.2d 661.

Although "the Speech and Debate provision in Article 10 of the Maryland Declaration of Rights ha[d] been equated with the federal constitution's Speech or Debate clause" before, in *Blondes,* we held, for the first time, that the provisions were to be construed in *pari materia. Id.*

In view of their common derivation and purpose, we hold that the legislative privilege afforded under the dual provisions in the organic law of the State should be construed *in pari materia* with Article I, Section 6 of the federal Constitution, subject to any limitation imposed by other provisions of the Maryland Constitution. *Compare Freedman v. State,* 233 Md. 498 [197 A.2d 232 (1964)], *reversed on other grounds,* 380 U.S. 51 [85 S.Ct. 734, 13 L.Ed.2d 649 (1965)]; *Brown v. State,* 233 Md. 288 [196 A.2d 614 (1964)]; *Bass v. State,* 182 Md. 496 [35 A.2d 155 (1944)]; *Blum v. State,* 94 Md. 375 [51 A. 26 (1902)]; *Lightman v. State,* 15 Md.App. 713 [294 A.2d 149 (1972)], all involving Maryland constitu-

tional provisions held to stand in *pari materia* with similar federal constitutional provisions.

*Id.* at 175–76, 294 A.2d 661.

We relied upon the Supreme Court's interpretation of the legislative privilege contained in the United States Constitution in reversing the court's decision in *Blondes. Id.* For guidance, we looked to *United States v. Brewster,* 408 U.S. 501, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972), where a United States Senator was charged with violating a federal bribery statute. *Id.* at 176, 294 A.2d 661. The trial court dismissed the indictment on the grounds that *United States v. Johnson,* 383 U.S. 169, 185, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966), barred the Senator "from any prosecution for alleged bribery to perform a legislative act." *Id.* at 176, 294 A.2d 661. We observed, however, that in *Brewster:*

> The Supreme Court concluded that *Johnson* was not authority for that holding; that what *Johnson* held was that the Speech or Debate clause in Article I, Section 6 of the federal Constitution protected members of Congress from inquiry into legislative acts or the motivation for actual performance of legislative acts; that how a legislator acted, voted, or decided was inadmissible evidence in a federal bribery prosecution; that a member of Congress could nevertheless be prosecuted under a criminal statute provided the Government's case did not rely on legislative acts or the motivation for legislative acts, *i.e.,* acts generally done in Congress in relation to the business before it; that the Speech or Debate clause reaches and prohibits inquiry only into those things said or done in the legislative body in the performance of official duties and the motivation for those acts.

*Id.* at 176–77, 294 A.2d 661 (citing *Brewster, supra* ). Thus, we stated, "it was the holding in *Brewster* that where no inquiry into legislative acts or motivation for legislative acts is necessary for the government to make out a *prima facie* case, the Speech or Debate clause does not prohibit prosecution." *Id.* at 177, 294 A.2d 661.

Further evaluating the conduct that falls within the definition of legislative acts, we looked to the Supreme Court's decision in *Gravel v. United States,* 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972), where the Supreme Court held that the federal Speech or Debate clause protected members of Congress " 'against prosecutions that directly impinge or threaten the legislative process.' " *Id.* at 178, 294 A.2d 661 (quoting *Gravel,* 408 at 616, 92 S.Ct. 2614). These acts, the Supreme Court held, include "committee reports, resolutions, and the act of voting" in addition to " 'a member's conduct at legislative committee hearings. . . .' " *Id.*

"Accepting the Supreme Court's interpretation of the legislative privilege as authoritative, and applying it to Article 10 of the Maryland Declaration of Rights and Section 18 of Article III of the Maryland Constitution," we reversed the trial court in *Blondes* because the "substantive evidence of legislative acts" introduced against Blondes "was inadmissible" and could not be considered harmless. *Id.* at 179, 294 A.2d 661.

We further addressed in *Blondes* the trial court's determination that the Senator could not be shielded by the speech and debate provisions in the Maryland Constitution because the Maryland Constitution also expressly requires the General Assembly to enact bribery laws applicable to certain enumerated public officials.

Article III, Section 50 provides:

Section 50. Legislature to provide penalty for bribery, etc., and for compelling testimony in such cases

It shall be the duty of the General Assembly, at its first session, held after the adoption of this Constitution, to provide by Law for the punishment, by fine, or imprisonment in the Penitentiary, or both, in the discretion of the Court, of any person, who shall bribe, or attempt to bribe, any Executive, or Judicial officer of the State of Maryland, or any member, or officer of the General Assembly of the State of Maryland, or of any Municipal corporation in the State of Maryland, or any Executive officer of such corporation, in order to influence him in the performance of any of

his official duties; and, also, to provide by Law for the punishment, by fine, or imprisonment in the Penitentiary, or both, in the discretion of the Court, of any of said officers, or members, who shall demand, or receive any bribe, fee, reward, or testimonial, for the performance of his official duties, or for neglecting, or failing to perform the same; and, also, to provide by Law for compelling any person, so bribing, or attempting to bribe, or so demanding, or receiving a bribe, fee, reward, or testimonial, to testify against any person, or persons, who may have committed any of said offenses; provided, that any person, so compelled to testify, shall be exempted from trial and punishment for the offence, of which he may have been guilty; and any person, convicted of such offense, shall, as part of the punishment thereof, be forever disfranchised and disqualified from holding any office of trust, or profit, in this State.

In *Blondes v. State,* 16 Md.App. at 182–85, 294 A.2d 661, we examined Article III, Section 50 and considered whether it conflicted with granting a speech and debate privilege to Blondes in a bribery prosecution:

We note, as hereinafter set forth, that bribery was a common law offense at the time the Maryland Constitution was enacted in 1867. *See* Perkins on Criminal Law, (2nd Ed. 1969), pp. 468–469. Reading the mandate of Section 50 literally, no directive was given that the offense of bribery be provided for by statute; rather it directed legislative enactment of a statute to punish that common law crime, "by fine, or imprisonment in the Penitentiary, or both, in the discretion of the Court," with the further direction that such punishment render the person convicted "forever disfranchised and disqualified from holding any office of trust or profit in this State."

We find little to support the lower court's conclusion that Section 50 constitutes an express exception to the legislative immunity provisions contained in Article 10 of the Maryland Declaration of Rights and Section 18 of Article III of the Maryland Constitution; those provisions, like the provisions of Section 50 of Article III, were included in the Constitu-

tion at the time of its enactment in 1867. Under well-established principles of constitutional construction, courts must construe the constitution as a whole, *Boyer v. Thurston,* 247 Md. 279 [231 A.2d 50 (1967) ], *Reed v. McKeldin,* 207 Md. 553 [115 A.2d 281 (1955) ], *Co. Com'rs v. Supervisors of Elec.,* 192 Md. 196 [63 A.2d 735 (1948) ], *Johnson v. Duke,* 180 Md. 434 [24 A.2d 304 (1942) ], harmonizing each provision with the other provisions thereof where possible to do so, *Reed v. McKeldin, supra, Co. Com'rs v. Supervisors of Elec., supra, Dyer v. Bayne,* 54 Md. 87 [ (1880) ], the construction being favored which will render every part and every word operative as against a construction which will render some portions or words nugatory, *Reed v. McKeldin, supra, Groome v. Gwinn,* 43 Md. 572 [ (1875) ].

*Id.* at 182–83, 294 A.2d 661.

We ultimately construed the section "as a limited mandate providing for punishment of State legislators guilty of bribery if indictment and prosecution therefore can be accompanied without impinging on the legislative privilege by introducing evidence of legislative acts." *Id.* at 183, 294 A.2d 661. This holding, we opined, insured "the degree of separation of powers inherent in our form of government...." *Id.* (citation omitted).

As we made clear in *Blondes, supra,* the speech and debate clause in the Federal Constitution applies only to members of Congress and the comparable provisions in the Maryland Constitution apply only to members of the General Assembly. We therefore agree with the State's position that neither of these provisions applies to members of local legislative bodies.

## II

### A

Our decision in *Montgomery County v. Schooley,* 97 Md. App. 107, 627 A.2d 69 (1993), where we first applied a comparable legislative privilege to local legislators as part of their common law official immunity, is at the center of the issue

presented to this Court by the parties, *i.e.*, the scope of the common law protection. In *Schooley*, a Montgomery County councilman was sued for his involvement in a redistricting plan that was ultimately adopted by Montgomery County. *Id.* at 108, 627 A.2d 69. A discovery dispute arose during the course of the litigation. *Id.* The plaintiffs attempted to depose the members of the County Council, and the County sought a protective order based on their status as local legislators. *Id.* The circuit court denied the motion and the county appealed. *Id.*

In *Schooley*, the Court observed that "[m]embers of local legislative bodies in Maryland, like the Montgomery County Council, are not directly within the ambit of either the State or Federal Constitutional immunity provisions, which apply only to the members of legislative bodies mentioned within them." *Id.* at 114, 627 A.2d 69. The Court, however, continued:

> The doctrine articulated in those provisions has, however, been regarded as applicable to members of local and regional legislative bodies (as well as to State legislatures, in addition to any specific State Constitutional provision) as a matter of common law—the "common law doctrine of official immunity." *Thillens, Inc. v. Community Currency Exchange,* 729 F.2d 1128, 1129 (7th Cir.), *cert. dismissed,* 469 U.S. 976, 105 S.Ct. 375, 83 L.Ed.2d 342 (1984).
>
> The source, nature, and scope of this common law privilege are not altogether clear and, to some extent, may depend on the context in which the privilege is asserted. When invoked in defense of a Federal criminal prosecution, for example, the common law privilege has been held to be inapplicable—"trumped" by the Supremacy Clause in the U.S. Constitution. *United States v. Gillock,* 445 U.S. 360, 100 S.Ct. 1185, 63 L.Ed.2d 454 (1980). When there is no such paramount Federal interest, however, the privilege has been respected by both Federal and State courts.

*Id.* at 114–15, 627 A.2d 69.

In examining the scope of the common law legislative privilege as applied to local legislators, this Court opined:

In *Lake Country Estates v. Tahoe Planning Agcy.*, 440 U.S. 391, 403, 99 S.Ct. 1171, 1178, 59 L.Ed.2d 401 (1979), the Court observed that the privilege had its roots in the parliamentary struggles of 16th and 17th century England and that "such immunity was consistently recognized in the common law and was taken as a matter of course by our Nation's founders." *See also Bruce v. Riddle*, 631 F.2d 272 (4th Cir.1980); *Baker v. Mayor and City Council of Baltimore*, 894 F.2d 679 (4th Cir.), *cert. denied*, 498 U.S. 815, 111 S.Ct. 56, 112 L.Ed.2d 31 (1990); *Hollyday v. Rainey*, 964 F.2d 1441 (4th Cir.), *cert. denied*, 506 U.S. 1014, 113 S.Ct. 636, 121 L.Ed.2d 567 (1992). In *Baker*, the Court, citing *Bruce*, declared it "beyond dispute that municipal legislators enjoy the protection of immunity when acting in the sphere of legitimate legislative activity." *Id.* at 681. *Subject to the consequences of the Supremacy Clause, that immunity, conferred as a matter of common law, appears to be co-extensive in scope with the Constitutional immunity enjoyed by members of Congress and the Maryland General Assembly.* In *Bruce v. Riddle, supra*, 631 F.2d at 279, the Fourth Circuit Court of Appeals referred to it as an "absolute" immunity.

*Id.* at 115, 627 A.2d 69 (emphasis added).

The State initially presents a perfunctory argument that there is no historical evidence that local or "subordinate legislators" have ever been accorded a common law legislative privilege, disregarding our holding in *Schooley, supra*, wherein we clearly recognized such a privilege. Alternatively, the State vehemently argues that the foregoing statements are *dicta* and ought not to be applied in this case because this case involves the application of the privilege to a local legislator in a *criminal* case and *Schooley* was a civil case. The State posits that "[t]he *dicta* in *Schooley*, appearing to state established law concerning the scope of common law 'official immunity', erroneously suggested that the doctrine extended far more broadly than it had been applied in any previous decision." Instead, the State contends that the common law legislative privilege had only been applied in Maryland to local

legislators in civil cases and that Maryland has never, and should never, allow local legislators to invoke the protections of legislative privilege in a state criminal prosecution.[4]

Appellee argues that the language suggesting that the common law legislative privilege applies to local legislators in criminal cases was not *dicta*, in part, because the language was later restated with approval by this Court in *Manders v. Brown, supra.* In *Manders*, the plaintiff sued city council members of the City of Crisfield, alleging that the Council violated the City Code when it secretly modified an urban renewal plan. *Id.* at 204, 643 A.2d 931. One of the three issues addressed by this Court was whether the actions of the members of the City Council were protected by common law legislative immunity. The Council members argued that the trial court properly dismissed Manders' complaint based upon the doctrine of legislative privilege. *Id.* at 205, 643 A.2d 931. Citing *Schooley, supra*, this writer penned for the Court:

> The privilege as it applies to Congress is found in the Speech or Debate Clause of the United States Constitution, Art. I, § 6; as to the Maryland General Assembly, the privilege is found in Article 10 of the Maryland Declaration of Rights and Art. III, § 18 of the State constitution. The majority of the Supreme Court case law focuses on the application of the federal constitutional privilege as it applies to Congress. *Despite the common law origins of legislative privilege as it applies to local legislative bodies,*

---

4. The State also cites *Baker v. State*, 27 Ind. 485 (1867), as the only case wherein a court considered the application of such a privilege in a criminal prosecution of a legislator not covered by a statutory or constitutional privilege prior to 1976. In *Baker*, the Supreme Court of Indiana reversed the trial court's ruling refusing to grant a new trial to members of the common council of the city of Evansville. The court stated that the council members "were in the exercise of a discretion given them by law. In such case, there is not individual liability, either civilly or criminally, unless they acted corruptly." *Id.* at 489. Thus, the State contends, without any further argument or explanation that, at most, if a local legislator is entitled to any immunity in a criminal prosecution, it would be qualified immunity. As we shall explain *infra*, we do not hold that local legislators may not be prosecuted; thus we find *Baker* inapposite as it relates to the potential for liability.

*federal and local privileges are essentially co-extensive. Schooley,* 97 Md.App. at 115 [627 A.2d 69]. Thus, in this context, a statement of law regarding a Member of Congress is applicable to a local legislator.

*Id.* at 205, 643 A.2d 931 (emphasis added). We again noted the purpose of the privilege is to "insure that the legislative function may be performed independently without fear of outside interference" by shielding legislators from "... 'the consequences of litigation's results but also from the burden of defending themselves.' " *Id.* (quoting *Schooley,* 97 Md.App. at 116, 627 A.2d 69).

*Manders* turned on whether the alleged "scuttling" of the prescribed legislative procedures for the City of Crisfield constituted "legislative acts" that should have been protected. *Id.* at 206–11, 643 A.2d 931. We remanded the case because

... the privilege, if it applies to appellees in this case, cannot turn on Manders's assertions that the appellees "scuttled" the redevelopment plan to accommodate the influential crab house owners and Dana Tawes, the owner of the adjacent Tawes Lumberyard, or to benefit their individual careers and social status. If it is determined that appellees acted in their legislative capacity in modifying the urban renewal plan, the privilege may very well protect them even if they modified it to accommodate a particular group.

On remand, a determination must be made as to whether the appellees were acting within the sphere of legitimate legislative activity.

*Id.* at 215, 643 A.2d 931.

The parties dispute the meaning of this Court's statements in *Schooley, supra,* later reiterated in *Manders,* that, "[d]espite the common law origins of legislative privilege as it applies to local legislative bodies, federal and local privileges are essentially co-extensive." *Manders,* 101 Md.App. at 205, 643 A.2d 931 (citing *Schooley,* 97 Md.App. at 115, 627 A.2d 69). The State argues that, although both the federal and Maryland speech and debate clauses expressly protect federal or state legislators in both civil and criminal cases, common law

legislative immunity should only protect local legislators in civil matters; thus, despite this Court's earlier statements in *Schooley* and *Manders, supra,* the State urges us to hold that common law legislative immunity and the federal privilege are not truly "co-extensive."

The essence of the State's argument is that, despite this Court's statements in *Schooley* and *Manders, supra,* "[c]loser examination of the [*Schooley*] opinion, the authorities cited therein, and their contexts reveals that *Schooley* stands for little more than the unremarkable proposition that Maryland, like virtually every other State and federal government, recognizes a common law legislative privilege applicable to local officials in *civil proceedings.*"

The authorities that we principally relied upon in *Schooley* in extending the legislative privilege to local legislators were *Thillens, Inc. v. Community Currency Exchange Ass'n,* 729 F.2d 1128, 1129 (7th Cir.), *cert. dismissed,* 469 U.S. 976, 105 S.Ct. 375, 83 L.Ed.2d 342 (1984) and *United States v. Gillock,* 445 U.S. 360, 100 S.Ct. 1185, 63 L.Ed.2d 454 (1980). In *Thillens,* the United States Court of Appeals for the Seventh Circuit addressed the application of legislative privilege to Illinois state legislators in a civil suit and held that "the doctrine of official immunity is clearly implicated in this federal civil action" because the "causes of action focus[ed] on the defendants' attempts to use their legislative positions to influence regulation of currency exchanges." *Thillens,* 729 F.2d at 1130.[5] The State aptly points out that in *Thillens* the

---

5. In *Thillens,* the court cited Judge Tone's concurring opinion in *United States v. Craig,* 528 F.2d 773, 781 (7th Cir.1976) (Tone, J., concurring), *cert. denied,* 425 U.S. 973, 96 S.Ct. 2171, 48 L.Ed.2d 796 (1976), which was later adopted as the opinion of the Seventh Circuit following an *en banc* review in *United States v. Craig,* 537 F.2d 957 (1976). The question before the *Craig* Court was "whether state legislators have a Speech or Debate privilege, conferred either by the Illinois Constitution or as a matter of federal common law, which bars admission of certain evidence against state legislators in a federal criminal prosecution." 528 F.2d at 775. Judge Tone's concurring opinion explained that the speech or debate clause of the Illinois Constitution did not apply in federal criminal prosecutions of Illinois state legislators and further,

court did not hold that common law immunity extends to criminal prosecutions, but merely addressed its application in civil cases.

Legislative immunity in criminal prosecutions was, however, addressed by the Supreme Court in *Gillock*, 445 U.S. 360, 100 S.Ct. 1185. The facts of *Gillock* are as follows.

A Tennessee state legislator was indicted on federal charges arising out of allegations that (1) he accepted money and, in exchange, used his public office to block the extradition of a criminal defendant from the state and (2) he agreed to introduce legislation that would permit individuals who had failed their examinations to become master electricians to obtain their licenses. *Id.* at 362, 100 S.Ct. 1185. The state senator moved to suppress all of the evidence relating to his legislative activities and the district court granted the motion based upon

---

that the state legislators were not entitled to a federal common law speech or debate privilege. *Id.* at 781. Judge Tone wrote that "whether the claimed privileged should be recognized as a development in the federal common law of evidence depends on whether there is an underlying immunity." *Id.* at 782. Common law immunity of state legislators, Judge Tone wrote, "has not been held to be coextensive with that which members of Congress enjoy under the federal speech or debate clause. Even with respect to civil liability, speech-or-debate immunity is broader than official immunity." *Id.* (citing *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975); *Powell v. McCormack*, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969)). Judge Tone analogized the common law immunity afforded to state legislators in federal courts to "official immunity" applied to the judiciary and stated that, "[u]nlike federal speech or debate immunity [*See United States v. Johnson*, 383 U.S. 169, 86 S.Ct. 749], common-law official immunity has not been extended to criminal liability." *Id.* (citing *O'Shea v. Littleton*, 414 U.S. 488, 503, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)).

The State's brief contains extensive verbatim quotations from Judge Tone's opinion and the State argues that this Court should follow the opinion later adopted by the Seventh Circuit, regarding common law immunity of *state* legislators in *federal* prosecutions in holding that the indictment against appellee was erroneously dismissed. Because the Supreme Court subsequently addressed the issues presented in *Craig* in *Gillock*, 445 U.S. 360, 100 S.Ct. 1185, we shall focus our analysis on the Court's decision in *Gillock*, in which the Supreme Court "granted *certiorari* to resolve a conflict in the Circuits...." 445 U.S. at 361–62, 100 S.Ct. 1185.

Rule 501 of the Federal Rules of Evidence, holding that the federal common law legislative immunity was the equivalent of the immunity granted to Congress under the Speech or Debate Clause, Art. I., § 6, cl. 1. *Id.* at 363, 100 S.Ct. 1185. The Government appealed the grant of the suppression motion and the Court of Appeals for the Sixth Circuit vacated the order and remanded the case for further consideration and application of the privilege to "particularize items of evidence." *Id.* On remand, the Government made a proffer and the District Court granted the renewed motion to exclude evidence of legislative acts, excluding Gillock's

> ... official request for an opinion from the Attorney General regarding extradition and the answer to that request, and Gillock's statements ... that he could exert pressure on the extradition hearing officer to block the extradition ... [and]
> ... all evidence regarding Gillock's introduction and support of the electricians' reciprocal licensing bill, his conversation with the private individuals who opposed the legislation, and the Governor's veto letter....

*Id.* at 365, 100 S.Ct. 1185.

The Government appealed the ruling on remand and the Court of Appeals affirmed. *Id.* at 366, 100 S.Ct. 1185. The Supreme Court

> ... granted certiorari to resolve a conflict in the Circuits over whether the federal courts in a federal criminal prosecution should recognize a legislative privilege barring the introduction of evidence of the legislative acts of a state legislator charged with taking bribes or otherwise obtaining money unlawfully through exploitation of his official position.

*Id.* at 361–62, 100 S.Ct. 1185 (footnote omitted).

Gillock argued that state legislators should have the benefit of an evidentiary privilege in a federal criminal prosecution because (1) "a speech or debate type privilege for state legislators in federal criminal cases is an established part of the federal common law and is therefore applicable through Rule 501" and (2) "... that even apart from Rule 501, a

legislative speech or debate privilege is compelled by principles of federalism...." *Id.* at 366, 100 S.Ct. 1185. The Supreme Court rejected both arguments.

Initially, the Court observed that "[t]he language and legislative history of Rule 501" did not provide support for Gillock's argument. *Id.* at 367, 100 S.Ct. 1185. "The Rule provides in relevant part that 'the privilege of a witness ... shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.'" *Id.* (quoting Federal Rule 501). The Court explained that, under the original draft of Rule 501 proposed by the Advisory Committee of the Judicial Conference of the United States "federal courts would have been permitted to apply only nine specifically enumerated privileges...." *Id.* The privilege claimed by Gillock was not listed among those enumerated privileges. Thus, the Court observed, "the claimed privilege was not thought to be either indelibly ensconced in our common law or an imperative of federalism." *Id.* at 368, 100 S.Ct. 1185 (footnote omitted). The Court further pointed out that, "the fact that there is an evidentiary privilege under the Tennessee Constitution, Art. II., § 13, which Gillock could assert in a criminal prosecution in state court does not compel an analogous privilege in a federal prosecution." *Id.*

Turning to Gillock's next argument, the Court also rejected Gillock's contention that "the historical antecedents and policy considerations which inspired the Speech or Debate Clause of the Federal Constitution should lead [the Supreme Court] to recognize a comparable evidentiary privilege for state legislators in federal prosecutions." *Id.* Initially, the Court traced the origins of the legislative immunity provided for in the Speech or Debate Clause.

Our cases, however, have made clear that "[although] the Speech or Debate Clause's historic roots are in English history, it must be interpreted in light of the American experience, and in the context of the American constitutional scheme of government rather than the English parliamentary system." *United States v. Brewster,* 408 U.S. at

508 [92 S.Ct. 2531]. In deciding whether the principles underlying the federal constitutional speech or debate privilege compel a similar evidentiary privilege on behalf of state legislators, the analysis must look primarily to the American experience, *including our structure of federalism which had no counterpart in England.*

*Id.* at 369, 100 S.Ct. 1185 (emphasis added).

The Supreme Court reiterated the two underlying rationales for the speech and debate privilege.

Two interrelated rationales underlie the Speech or Debate Clause: first, the need to avoid intrusion by the Executive or Judiciary into the affairs of a coequal branch, and second, the desire to protect legislative independence. *Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 502–503 [95 S.Ct. 1813, 44 L.Ed.2d 324] (1975). Cases considering the Speech or Debate Clause have frequently arisen in the context of a federal criminal prosecution of a Member of Congress and have therefore accented the first rationale. Only recently in such a case, we re-emphasized that a central purpose of the Clause is "to preserve the constitutional structure of separate, coequal, and independent branches of government. The English and American history of the privilege suggests that any lesser standard would risk intrusion by the Executive and the Judiciary into the sphere of protected legislative activities." *United States v. Helstoski,* 442 U.S. [477], at 491 [99 S.Ct. 2432, 61 L.Ed.2d 12 (1979)]. *Accord, United States v. Johnson, supra,* at 180–181 [86 S.Ct. 749]. The Framers viewed the speech or debate privilege as fundamental to the system of checks and balances. The Works of Thomas Jefferson 322 (Ford ed. 1904); 1 The Works of James Wilson 421 (R. McCloskey ed. 1967).

*Id.* 369–70, 100 S.Ct. 1185.

The Court observed that declining to apply the privilege to state legislatures in federal prosecutions does not create a separation of powers problem. *Id.* Although "the Federal Government has limited powers with respect to the states,

unlike the unfettered authority which English monarchs exercised over Parliament[,]" because the Supremacy Clause "dictates that federal enactments will prevail over competing state exercises of power[,]" the Court opined, "we do not have the struggles for power between the federal and state systems such as inspired the need for the Speech or Debate Clause as a restraint on the Federal Executive or to protect federal legislatures." *Id.* at 370, 100 S.Ct. 1185. The Court concluded that "federal interference in the state legislative process is not on the same constitutional footing with the interference of one branch of the Federal Government in the affairs of a coequal branch." *Id.* (citing *Baker v. Carr,* 369 U.S. 186, 210, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)). Finally, the Supreme Court rejected Gillock's assertion that the denial of the evidentiary privilege was tantamount to the federal government invading "essential state functions." *Id.* at 371, 100 S.Ct. 1185.

Turning to the second rationale for legislative immunity—the need for legislative independence—the Court held that the concern did not compel application of the privilege to a state legislator in a *criminal* case. *Id.* at 371, 100 S.Ct. 1185. In support of his argument, Gillock relied on *Tenney v. Brandhove,* 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951). *Id.* "The issue there, however, was whether state legislators were immune from civil suits for alleged violations of civil rights under 42 U.S.C. § 1983." *Id.* The Court drew a distinction between Gillock's case and *Tenney,* where the Supreme Court held that, in enacting the [42 U.S.C. § 1983], it doubted that Congress, " 'itself a staunch advocate of legislative freedom, would impinge on a tradition so well-grounded in history . . . by covert inclusion in the general language of [§ 1983].' " *Id.* (quoting *Tenney,* 341 U.S. at 376, 71 S.Ct. 783.) The Court distinguished *Tenney.* "First, *Tenney* was a civil action brought by a private plaintiff to vindicate private rights. Moreover, the cases in this Court which have recognized an immunity from civil suit for state officials have presumed the existence of federal criminal liability as a restraining factor on the conduct of state officials." *Id.* at 372, 100 S.Ct. 1185.

The *Gillock* Court, citing *O'Shea v. Littleton,* 414 U.S. 488, 503, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974),[6] observed that "in protecting the independence of state legislators, *Tenney* and subsequent cases on official immunity have drawn the line at civil actions." *Id.* at 373, 100 S.Ct. 1185 (footnote omitted). The Court further explained, to the extent that denying the federal common law privilege's application to state legislators infringed upon the state legislative process, it was permissible when weighed against the interest of the Federal Government "in enforcing its criminal statutes" as compared to the "only speculative benefit to the State legislative process." *Id.* at 373, 100 S.Ct. 1185 (citing *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974)) (holding that the risk of limiting candor in the Executive Branch was outweighed by the interest in the judiciary securing all relevant evidence in a criminal proceeding).

Ultimately, the Court concluded, *id.* at 374, 100 S.Ct. 1185:

The Federal Speech or Debate Clause, of course, is a limitation on the Federal Executive, but by its terms is confined to federal legislators. The Tennessee Speech or Debate Clause is in terms a limit only on the prosecutorial powers of that State. Congress might have provided that a state legislator prosecuted under federal law should be accorded the same evidentiary privileges as a Member of Congress. Alternatively, Congress could have imported the "spirit" of *Erie R. Co. v. Tompkins,* 304 U.S. 64 [58 S.Ct. 817, 82 L.Ed. 1188] (1938), into federal criminal law and directed federal courts to apply to a state legislator the

---

**6.** In *O'Shea v. Littleton,* the Supreme Court held that a class action filed against a magistrate and associate judge alleging racial discrimination in the criminal justice system failed to present a justiciable case in controversy. The Court also held that the Court of Appeals erred in deciding that the District Court should have entertained the plaintiff's claims, explaining that it is not true "that unless the injunction sought is available federal law will exercise no deterrent effect...." *Id.* at 503, 94 S.Ct. 669. The Court observed that "whatever may be the case with respect to civil liability generally .... we have never held that the performance of the duties of judicial, legislative, or executive officers, requires or contemplates immunization of otherwise criminal deprivations of rights." *Id.* (citations omitted).

same evidentiary privileges available in a prosecution of a similar charge in the courts of the state. But Congress has chosen neither of these courses.

In the absence of a constitutional limitation on the power of Congress to make state officials, like all other persons, subject to federal criminal sanctions, we discern no basis in these circumstances for a judicially created limitation that handicaps proof of the relevant facts.

*Id.* 374, 100 S.Ct. 1185.

## B

Few state courts have reported decisions since *Gillock*, *supra*, on the application of the legislative privilege to local legislators in *state* criminal prosecutions. The number of reported cases decided by the nation's federal courts are legion,[7] but we find those cases to be inapposite for the same reason cited by the circuit court, to wit: in *Gillock*, the Supreme Court concluded that such a state-created privilege was not a part of the federal common law, and its recognition in federal court was not compelled by principles of federalism in a federal criminal prosecution of a state senator.[8] While instructive, *Gillock* sheds little light on whether the privilege is available to a local legislator in a Maryland criminal prosecution.

The trial court cited *D'Amato v. Superior Court*, 167 Cal. App.4th 861, 84 Cal.Rptr.3d 497 (2008) for the proposition that local legislators should be entitled to the same privilege in criminal prosecutions as they are in civil suits because the threats to legislative independence are equally as significant.

---

**7.** *See, e.g., United States v. Burgin*, 621 F.2d 1352, 1359 (5th Cir.1980); *In re Grand Jury*, 821 F.2d 946 (3d Cir.1987); *United States v. Cartledge*, 928 F.2d 93, 96–97 (4th Cir.1991); *United States v. Fumo*, 628 F.Supp.2d 573, 580–82 (E.D.Pa.2007).

**8.** For an in-depth discussion on *Gillock* and the value of state legislative privileges, *see* Steven F. Huefner, *The Neglected Value of the Legislative Privilege in State Legislatures*, 45 WM. & MARY L.REV. 221, 300–04 (Oct. 2003).

In *D'Amato,* a City Administrator was charged with two counts of aiding and abetting a board member of a group, assembled by the City for the purpose of acquiring federal funding for a project, in violating California conflict of interest laws because the board member had a financial interest in a contract for which D'Amato had advocated in his capacity as City Administrator. *Id.* at 503–04. The *D'Amato* Court explained that, by enacting the conflict of interest statute, the California legislature created a "conclusive presumption of divided loyalty where a public official holds a personal financial interest, [and] the Legislature avoided the prospect of executive and judicial officers delving into the subjective motivations of public officials performing their legislative duties." *Id.* at 505. This, the court recognized, was purposefully done so as not to violate separation of powers. *Id.* "This respect for the deliberative processes of local governmental agencies derives from the separation of powers doctrine, embodied in the California Constitution. . . ." *Id.*

The court observed that the California Constitution does not contain an express separation of powers provision applicable to local government, but that the state legislature provided municipalities the authority to conduct their own government. *Id.* "When the Legislature confers legislative power on a municipal body, a judicial or executive body may not interfere with that power, except as the Legislature authorizes." *Id.* at 505. Further, the Court explained that, in order to make a determination of guilt under a theory of aider and abettor liability, there must be proof of the aider and abettors intent or motive and "this inquiry directly contravenes the separation of powers principles. . . ." *Id.* at 506. Thus, the court observed that an "important corollary of the separation of power doctrine is courts cannot inquire into the impetus or motive behind legislative action.'" *Id.* at 505 (quoting *Steiner v. Superior Court,* 50 Cal.App.4th 1771, 58 Cal.Rptr.2d 668, 676 (1996)).

The *D'Amato* Court also explained, citing *Steiner,* 58 Cal. Rptr.2d at 678, that the "level of intimidation against a local legislator arising from the threat of a criminal proceeding is at

least as great as the threat from a civil suit." *D'Amato,* 84 Cal.Rptr.3d at 507. Ultimately, the Court determined that the legislature did not make clear that it intended to overrule the common law doctrine of legislative immunity and it "should not be abrogated absent clear legislative intent to do so." *Id.* at 508.

The State argues that the holding in *D'Amato* that "the separation of powers doctrine bars criminal prosecution of a public official for aiding and abetting another's [conflict of interest statute] violation based on that official's legislative activities ..." *id.* at 510, is inapposite because there is no separation of powers problem implicated when a State prosecutor prosecutes a local legislator in Maryland. Instead, the State urges this Court to follow two other state court decisions, *People v. Scharlau,* 141 Ill.2d 180, 152 Ill.Dec. 401, 565 N.E.2d 1319 (1990) and *Girardeau v. State,* 403 So.2d 513 (Fla.Ct.App.1981).

The State postulates that "The Supreme Court of Illinois had occasion to consider the effect of *Gillock* in a State criminal case against a local legislator in *People v. Scharlau* ...." In *Scharlau,* the Supreme Court of Illinois reviewed the convictions of four elected commissioners of the City of Danville for "official misconduct" under the state's conflict of interest laws. 152 Ill.Dec. 401, 565 N.E.2d at 1320. The commissioners were convicted based upon their involvement in the settlement of a lawsuit, the terms of which "changed Danville's municipal government from a mayor-commissioner system, where commissioners were elected city-wide, to a mayor-alderman system with the City divided into separate aldermanic districts. However, the settlement also guaranteed that defendants would be placed, by appointment, in newly created administrative positions...." *Id.,* 152 Ill.Dec. 401, 565 N.E.2d at 1320–21.

The *Scharlau* Court, far from "considering the effect of *Gillock* in a state criminal case," actually engaged in an exhaustive interpretation of the language of an Illinois conflict of interest statute and the propriety of the defendants' actions

in settling a law suit. Only in the very last paragraph of the opinion did the court have occasion to comment, in *dicta*, on the issue of legislative immunity:

> Finally, the defendants cannot rely on the doctrine of legislative immunity to protect them from prosecution. This issue was never raised by defendants prior to their appeal; therefore, the issue is waived. (*People v. Dale* (1986), 112 Ill.2d 460, 467, 98 Ill.Dec. 39, 493 N.E.2d 1060 (nonjurisdictional questions not properly presented to trial court are not considered on appeal).) Even if the issue had been preserved for review, however, defendants would not prevail. If courts are not allowed to inquire into the negotiation process of public officials engaged in their official legislative duties, the State could never prosecute public officials under the statutes which prohibit self-dealing. While defendants may have been immune from civil liability under the doctrine of legislative privilege, we cannot allow them to conceal their criminal violations and escape punishment merely because they committed their crimes while performing legislative duties. *United States v. Gillock* (1980), 445 U.S. 360, 372–73, 100 S.Ct. 1185, 1193–94, 63 L.Ed.2d 454, 464–65.

*Id.*, 152 Ill.Dec. 401, 565 N.E.2d at 1330.

Noticeably absent from the *Scharlau* opinion is *any* analysis of either a state or federal speech and debate clause, or the existence of common law legislative immunity. Rather, as the circuit court correctly recognized, the issue was not preserved for appeal and thus the *Scharlau* Court's analysis of the immunity issue was cursory and perfunctory.

The State further asserts that, "in a similar vein, the Florida Court of Appeal refused to extend legislative privilege in a criminal case in *Girardeau v. State*, [403 So.2d 513]...." The *Girardeau* Court addressed the question of whether a Florida state legislator "may lawfully assert a privilege of nondisclosure of information received by him in connection with the discharge of his duties as a legislator, when that information is sought by a grand jury in connection with its investiga-

tion of a crime." *Id.* at 514. Girardeau, a member of the Florida House of Representatives, became involved in a legislative investigation of the Department of Corrections regarding inmate abuse and allegations of an inmate's death. *Id.* At the same time, a grand jury also began an investigation regarding the same inmate's death and, as a result, Girardeau was served with a subpoena to appear and "to bring any tapes, documents or materials in his possession relating to the [inmate's] death." *Id.* The trial court denied Girardeau's motion to quash the subpoena. Girardeau refused to testify and "was adjudged in contempt of court...." *Id.*

Girardeau argued that he was entitled to legislative immunity and thus should not have been compelled to testify. He conceded "... the absence of any express constitutional or statutory provision authorizing the invocation of the privilege asserted." *Id.* The court explained that Girardeau's "assumptions concerning the existence of the privilege are based primarily upon premises extracted from two Florida constitutional provisions, aided by principles drawn from federal and state constitutional law...." *Id.* Although the Florida constitution does not contain a speech and debate clause, Girardeau argued that the Florida constitution provides legislators the authority to conduct investigations. *Id.* By contrast, he pointed out that, although the United States Constitution does not expressly provide Congress the authority to conduct investigations, "the United States Supreme Court has ruled that inherent in the power of congress to legislate is the power to investigate any matter which may result in the development of future legislation." *Id.* at 515 (citing *Sinclair v. United States,* 279 U.S. 749, 49 S.Ct. 471, 73 L.Ed. 938 (1928); *McGrain v. Daugherty,* 273 U.S. 135, 47 S.Ct. 319, 71 L.Ed. 580 (1926)). Similarly, Girardeau argued, the United States Constitution does not contain an express provision mandating the separation of powers, but it is "firmly established that the power of one branch of government cannot be usurped or interfered with by a different branch." *Id.* (citing *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952)).

An express speech and debate clause in the Florida constitution, Girardeau claimed, was unnecessary because of the "interplay" between the provision regarding the legislature's power to conduct investigations and the express separation of powers clause. The court observed:

[Girardeau] then urges this court to adopt what he refers to as an "expansive interpretation" of these two constitutional provisions and to conclude that the express power to conduct legislative investigations, when considered in connection with the express separation of powers doctrine embodied in the Florida Constitution, implies the ability of the legislature to refuse to disclose its findings "when necessary." [Girardeau] argues for a broad construction of Article III, Section 5, absent which, in [Girardeau's] view, the ability of the legislature to conduct its investigations would be severely diminished and legislative integrity would be disrupted by the judicial branch of government, through its grand jury.

*Id.* at 516 (footnotes omitted).

The court essentially rejected Girardeau's argument, holding:

These arguments, briefly summarized above, would merit serious consideration were we called upon in this case to sanction the invocation of privileges and immunities similar to those which have been found to exist under the federal speech or debate clause. However, in the context of this case, they are not compelling.

In reaching our decision we are not called upon and do not decide the scope or even the existence of a "legislative privilege" similar to that provided to members of Congress under the speech and debate clause. There is every reason to believe that all due deference will and should be extended by the judicial branch to any properly asserted legislative claim of privilege, and it is imperative that it be kept in mind that such claims of privilege are supported by substantial authority. "Legislators are immune from deterrents to the uninhibited discharge of their legislative duty, not for

their private indulgence but for the public good." *Tenney v. Brandhove,* 341 U.S. 367, 377, 71 S.Ct. 783, 788, 95 L.Ed. 1019 (1931)( [1951] ); and see 72 Am. Jur. 2d, States, etc., § 55. However, even assuming (without deciding) the existence of a legislative power to conduct confidential investigations and a generalized privilege on the part of a member to refuse to disclose evidence received in the course of such an investigation, any such claim of confidentiality cannot override or defeat the pressing need of the criminal justice system, of which the grand jury is an integral part, for evidence of a crime alleged to have been committed in the state.

*Id.* at 516–17 (footnote omitted).

The *Girardeau* Court cited *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) and noted that "even the power of the President of the United States cannot override the power of the judicial branch to compel a full disclosure of the facts in a criminal investigation." *Girardeau,* 403 So.2d at 517.

While the considerations of a legislator's duties and the need to prosecute criminal violations are relevant, the precise issue before this Court was not before the court in *Girardeau, supra.* *Girardeau* was limited to the question of whether a Florida legislator has the right to conduct confidential investigations. The absence of a state constitutional speech and debate provision and a concomitant common law legislative privilege in Florida, in our view, renders the *Girardeau* decision inapposite to the issue at hand.

## C

The State urges this Court to "follow *Gillock,*" as it claims the *Scharlau* and *Girardeau* courts did, and reject the application of common law legislative immunity to local legislators in state criminal prosecutions. Focusing on the primary authorities upon which the Supreme Court relied, *i.e.* the Supremacy Clause and separation of powers, the State argues that both considerations are applicable in the context of the case *sub*

*judice* and militate toward holding that the common law privilege should not apply to local legislators in this context.

Initially, the State argues that "the relationship between the State and the Baltimore City Council is closely analogous to the relationship between Federal government and the State." Citing *Worton Creek Marina v. Claggett*, 381 Md. 499, 850 A.2d 1169 (2004), the State argues that, although there is no supremacy clause in the Maryland Constitution, while there is one in the federal constitution, "the same principle is equally applicable to the relationship between the State law [sic] and those of local jurisdictions."

In *Worton Creek Marina*, the Court of Appeals held that a local ordinance, enacted by Kent County, that allowed commercial boat moorings to remain "within another riparian's extended property line" for two months of the waterfowl season was preempted by the State Boat Act "because it permit[ted] an act prohibited by State law." *Id.* at 502, 850 A.2d 1169. Beyond simply citing *Worton Creek Marina*, the State presents no argument or explanation of its position. Implicit, however, in the State's allusion to the federal Supremacy Clause is that we should infer, from the Court's statements in *Worton Creek Marina*, that the State government reigns supreme and that any privilege asserted by a local legislator should not stand in the face of a prosecution initiated by the State. This is so, urges the State, because local ordinances " 'must not directly or indirectly contravene general law . . .' " or " '. . . directly or indirectly [ ] permit acts or occupations which the State statutes prohibit, or to prohibit acts permitted by statute or constitution. . . .' " *Id.* at 513, 850 A.2d 1169 (quoting *Rossberg v. State*, 111 Md. 394, 416–17, 74 A. 581 (1909)).

Appellee argues that there is no support for the State's contention that it stands in a similar position as the federal government in relationship to local governments, at least with respect to the common law legislative privilege. Appellee further counters that she did not invoke "a protection created by Baltimore City" but rather "a protection that exists state-

wide...." Thus, maintains appellee, there is no conflict or issue of preemption. Appellee further asserts that "[t]he State is seeking a wholesale grant of power that when it believes its interests are superior to the privileges and protections that might stand in the way of its prosecution, the protections of the defendant should fail." According to appellee, in the absence of any authority in support of the State's position that a local legislator is less deserving of the protections of the legislative privilege, we should hold that a local legislator, like a state legislator, may not be compelled to explain his or her motivations in voting, even in a state criminal prosecution.

We agree with appellee that there is no issue of a conflict between a local ordinance or enactment and State law, as there is no local privilege at issue in this case that is competing with a State privilege. Rather, appellee sought the common law protections, previously accorded by this Court to local legislators in civil cases, to prevent evidence of her voting and other legislative acts from being used as evidence of a criminal act. Thus, we need not consider whether a local ordinance conflicts with a state law or whether state law has preempted a particular area. *Cf. Worton Creek Marina,* 381 Md. at 514, 850 A.2d 1169; *Rossberg,* 111 Md. at 416–14, 74 A. 581; *Montgomery County Bd. of Realtors v. Montgomery County,* 287 Md. 101, 411 A.2d 97 (1980); *Montgomery County v. Bd. of Elections,* 311 Md. 512, 536 A.2d 641 (1988). *See also* J. Scott Smith, *State and Local Legislative Powers: An Analysis of the Conflict and Preemption Doctrines in Maryland,* 8 U. BALT. L.REV. 300, 306–14 (1979).

The Supreme Court pointed out in *Gillock* that "the fact that there is an evidentiary privilege under the Tennessee Constitution ... which Gillock could assert in a criminal prosecution in a state court, does not compel an analogous privilege in a federal prosecution." 445 U.S. at 368, 100 S.Ct. 1185. Patently, the Court's decision in *Gillock* turned on the question of whether to recognize a state privilege in the face of the competing federal interest in a criminal prosecution when such a privilege existed at the state level and would

otherwise have applied if the prosecution were in a Tennessee court or, if Gillock had been a member of Congress and was prosecuted in a federal court. This, however, significantly differs from the case *sub judice*, as appellee invokes a Maryland common law privilege in a Maryland court that a member of the General Assembly could assert in a criminal prosecution. As we stated in *Schooley*, 97 Md.App. at 115, 627 A.2d 69, in our discussion of *Gillock*, "[w]hen there is no such paramount federal interest, however, the privilege has been respected by both Federal and State courts." The State's interest in a criminal prosecution, in our view, cannot be considered paramount to the state common law privilege. Accordingly, we are unpersuaded by appellant's argument based on the supremacy clause.

The second prong of the State's argument based on *Gillock* is that "[i]n Maryland, as under federal law, the separation of powers doctrine does not furnish a basis for extending the doctrine of official immunity to a State prosecution of a member of a local city council." According to the State, this is because the Court of Appeals clearly held, in *Wicomico County v. Todd*, 256 Md. 459, 464–65, 260 A.2d 328 (1970), that separation of powers, provided for in Article 8 of the Maryland Declaration of Rights, does not apply to local governments in Maryland. The State seizes upon the need identified in *Gillock* to "avoid intrusion by the Executive or Judiciary into the affairs of a *coequal branch* . . . ." 445 U.S. at 369, 445 U.S. 360 (emphasis added) and points out that the Baltimore City Council and the State Prosecutor are not members of coequal branches of government because the Baltimore City Council is a local legislator, while the State Prosecutor is a member of the State Executive branch of government.

*Todd*, however, does not address separation of powers of state vis a vis local government, but instead examines the propriety of the actions of the Wicomico County government regarding the alleged executive interference with the legislative process within the local government. *Todd*, 256 Md. at 464–65, 260 A.2d 328. In *Todd*, the Court cited *Pressman v. D'Alesandro*, 193 Md. 672, 679, 69 A.2d 453 (1949) for the

proposition that " 'the constitutional requirement of separation of powers is not applicable to local government,' the question of just how much power has been granted being one of statutory construction." *Todd,* 256 Md. at 464–65, 260 A.2d 328 (quoting *Pressman,* 193 Md. at 679, 69 A.2d 453).

In *Pressman,* in addressing alleged conflicts between two provisions of the Baltimore City Charter, the Court of Appeals opined:

The basic question now presented is not whether the City Council can delegate legislative power, but whether the Legislature has conferred, by the Baltimore charter or otherwise, power—of whatever nature, legislative or executive or both—to make the choice of alternatives. There can be no question as to the power of the Legislature to make such grants of powers of local government, whether to an existing municipal corporation or agency, a specially constituted body, or an existing executive or administrative body such as county commissioners. *The constitutional requirement of separation of powers is not applicable to local government. Baltimore City v. Flack,* 104 Md. 107, 119– 123, 64 A. 702 [ (1906) ]; *Gordon v. Montgomery County,* 164 Md. 210, 212–214, 164 A. 676 [ (1933) ]; *Schneider v. Lansdale,* 191 Md. 317, 326, 61 A.2d 671, 675 [ (1948) ]. *Just how much power is granted by a particular statute is a question of statutory construction,* (*Renshaw v. Grace,* 155 Md. 294, 142 A. 99 [ (1928) ] ), *not a constitutional question.* In the past municipal charters, through imitation of state and federal constitutions, often made a separation of powers similar to the constitutional separation. Such charters gave rise to questions of statutory construction similar to constitutional questions of separation of powers. *Baltimore v. Wollman,* 123 Md. 310, 316, 91 A. 339 [ (1914) ]. The new Baltimore charter and other recent charters reflect less imitation of state and federal frames of government and greater recognition of functions and problems characteristic of municipal government.

*Id.* at 678–79, 69 A.2d 453 (emphasis added). Thus, the State contends that, unlike in California, separation of powers is of no concern at the local level in Maryland.

Appellee counters that the State's argument ignores the circuit court's determination that the Baltimore City Council (the legislator) is a co-equal branch of the Baltimore City Grand Jury (the judiciary) and thus, there is a problem of separation of powers between co—equal branches in this case. The Baltimore City Circuit Court is part of the State judiciary branch. M.D. CONST. art. IV.

The circuit court determined that, although it is a Maryland court, it should be considered part of the local government of Baltimore City because its jurisdiction is over Baltimore City and the Baltimore Grand Jury is "a body whose jurisdiction is limited to crimes committed in Baltimore City." The circuit court erred in concluding that the Baltimore City Grand Jury and the circuit court were co-equal branches of government with the Baltimore City Council. The State correctly points out that the Baltimore City Charter provides for two "branches" of local government: the City Council as the "legislative department", Article III, Section 1(a) and the Mayor as the "chief executive," Article IV, Section 1(a).

While the City Council is not a part of the State government and not "co-equal" with the State Prosecutor, we cannot discount the fact that local governments have been granted the power to engage in legislative functions. Article XI–A of the Maryland Constitution provides for the adoption of local charters and Article XI–A, Section 2 provides:

The General Assembly shall by public general law provide a grant of express powers for such County or Counties as may thereafter form a charter under the provisions of this Article. Such express powers granted to the Counties and the powers heretofore granted to the City of Baltimore, as set forth in Article 4, Section 6, Public Local Laws of Maryland, shall not be enlarged or extended by any charter formed under the provisions of this Article, but such powers

may be extended, modified, amended or repealed by the General Assembly.

In *Ritchmount Partnership v. Bd. of Supervisors of Elections for Anne Arundel County,* 283 Md. 48, 57, 388 A.2d 523 (1978), the Court of Appeals explained:

> The exercise of local legislative powers is subject at all times to provisions of the Constitution and general law, and is limited to those matters allocated by the express powers which the Legislature has delegated under Article 25A of the Annotated Code. Md. Const., Art. XI–A, §§ 1 & 3; *Mont. Citizens League v. Greenhalgh,* 253 Md. 151, 158, 252 A.2d 242 (1969); J. Spencer, Contemporary Local Government in Maryland 22 (1965). Article XI–A does not in and of itself confer legislative power upon the counties. Instead it mandates that the General Assembly expressly enumerate and delegate those powers exercisable by counties electing a charter form of government. Md. Const., Art. XI–A, § 2. In compliance with this constitutional injunction, the Legislature enacted in 1918 the Express Powers Act, which, as amended, endows charter counties with a wide array of legislative and administrative powers over local affairs. Art. 25A, § 5. These "legislative powers" are those usually associated with the objects of government—that is, powers to legislate for the benefit of the health, safety and general welfare of the local community.

*Id.* (footnote omitted).

In Maryland, as in California, "the local law-making power exists by reason of a statutory grant of authority...." *Id.* at 58, 388 A.2d 523. Thus, we hold that, in the words of the *D'Amato* Court, "[w]hen the Legislature confers legislative power on a municipal body, a judicial or executive body may not interfere with that legislative power, except as the Legislature authorizes." 84 Cal.Rptr.3d at 505 (citation omitted).

The State has not cited to this Court any statute that would indicate that the common law legislative privilege is not applicable in the case at hand. Moreover, in our previous

decisions, when we applied the common law doctrine of legislative privilege to local legislators, albeit in the civil context, considerations of ensuring separation of powers among co-equal branches and the State's "supreme" position in preempting conflicting local ordinances did not cause us to hold the privilege inapplicable to local legislators. In short, appellant presents this Court with no reason to renounce our previous decision to "adopt" the common law privilege and consider it "co-extensive" with the state and federal constitutional privileges. *Schooley,* 97 Md.App. at 115, 627 A.2d 69. Neither do we discern any reason why our statement in *Manders,* that, "in this context, a statement regarding a Member of Congress is applicable to a local legislator" to no longer be a correct statement of the law. 101 Md.App. at 205, 643 A.2d 931. Neither a State nor Federal legislator may have his/her legislative acts introduced as evidence against said legislator. *See, e.g., United States v. Brewster,* 408 U.S. at 512, 92 S.Ct. 2531 ("a Member of Congress may be prosecuted under a criminal statute provided that the Government's case does not rely on legislative acts or the motivation for legislative acts."). Accordingly, we hold that, as a matter of common law, local legislators may invoke that same privilege in a criminal prosecution.

### III

■ Subsequent to oral argument before this Court, the applicability of Courts and Judicial Proceedings Article, § 5–501, *vel non,* to the issues at hand, was deemed to warrant consideration. A fair reading of § 5–501 intimates a legislative imperative that local legislators enjoy the same protection as the protection that State legislators have against being forced to defend or explain their legislative conduct. Section 5–501 provides:

Action for defamation against local government official.

A civil or criminal action may not be brought against a city or town councilman, county commissioner, county councilman, or similar official by whatever name known, for

words spoken at a meeting of the council or board of commissioners or at a meeting of a committee or subcommittee thereof.

This statute has not been judicially interpreted in a criminal context and was not addressed in either *Schooley* or *Manders, supra.* In response to our instructions, the State Prosecutor and appellee briefed the issue of whether the statute applies to the case *sub judice* and both parties are of the view that the statute is inapplicable to this case. The State Prosecutor avers that the statute applies only to actions for defamation but not actions for bribery and, thus, has no relevance to the case. The State Prosecutor bases his position on the manner in which the statute is captioned and the fact that it immunizes local officials from "words spoken," which he asserts can only be construed as an action for defamation. Appellee likewise is of the view that the statute's application is limited to defamation actions, but acknowledges that "the need to protect the legislative process appears to be the motivating factor," rendering it consistent with the state constitutional speech and debate protections. We agree, in part, with appellee.

We do not share the parties' view that the statute is limited to defamation actions against local legislators. Such a view improperly elevates the effect of a mere caption and ignores the plain language of the statute itself as well as its legislative history. The statute was initially enacted by 1973 Md. Laws, ch. 287 for the purpose, according to its title, of providing that "certain officials shall not be liable in *any* civil action or *criminal prosecution* for words spoken in debate." (Emphasis added). Intending to cover all local legislators it added, in nearly identical language, to each of the Code articles dealing with municipal and county legislative bodies (Articles 23A, 25, 25A and 25B) that no such local legislator—town councilman, county commissioner, county councilman, code county commissioner or similar official—"shall be liable in any civil action or criminal prosecution for words spoken in debate at [a meeting of the applicable legislative body]." The meaning and effect of that statute could not be clearer. That language was lifted directly from Article III, Section 18 of the Maryland Constitu-

tion and must be construed as having the same effect—to provide the same level and scope of protection to the local legislators as is enjoyed by members of the General Assembly.

A few months after the enactment of that statute, the General Assembly returned for a special summer session in order to begin implementation of the code revision process—the non-substantive re-writing of the 1957 Code in a more topical and coherent manner. One of the volumes produced at that special session was the Courts and Judicial Proceedings Article, which was intended as a generally non-substantive collection and revision of the laws relating to judicial proceedings. *See* 1973 Md. Laws (1st Sp. Sess.) Ch. 2, § 1. In furtherance of that purpose and intent, the sections added to Articles 23A, 25, 25A and 25B just months earlier were consolidated and re-styled as Section 5-304 of the new Article. The new section read:

A civil or criminal action may not be brought against a city or town councilman, county commissioner, county councilman, or similar official by whatever name known, for words spoken at a meeting of the council or board of commissioners.

That no substantive change was intended by the rewording of the language is evident from the Revisor's Note that immediately followed the section: "This section is new language derived from Art. 23A, § 1A, Art. 25, § 1A, Art. 25A, § 3, and Art. 25B, § 10A. . . ."

In 1976, the statute was expanded to provide protection not only for legislative conduct at meetings of the council or board itself but also subcommittee meetings. *See* 1976 Md. Laws, Ch. 355. In 1977, the section was moved to its present location, Section 5-501, without any substantive change.

■ Unfortunately, the advisory body tasked with drafting the new Courts and Judicial Proceedings Article added as a caption to the section "Action for defamation against local government official" and that caption has remained with the section. The parties have seized upon that caption as limiting the scope of the statute itself, which we find to be inappropri-

ate and inadmissible. In determining the meaning of a statute, we look to the words of the statute itself, not a caption. *W. Corr. Inst. v. Geiger,* 371 Md. 125, 141, 807 A.2d 32 (2002) ("In seeking to ascertain legislative intent, we first look to the words of the statute . . . .") (citations omitted); *Derry v. State,* 358 Md. 325, 335, 748 A.2d 478 (2000) (Courts view the words of a statute ". . . in ordinary terms, in their natural meaning, in the manner in which they are most commonly understood."); *Degren v. State,* 352 Md. 400, 417, 722 A.2d 887 (1999) ("Where the statutory language is plain and free from ambiguity, and expresses a definite and simple meaning, courts do not normally look beyond the words of the statute itself to determine legislative intent.") (citations omitted). Captions and headings are mere catchwords and can never be taken to limit or expand the plain meaning of the statutory language. The Legislature itself has made that clear. Article 1, Section 18 provides:

> The captions or headlines of the several sections of this Code which are printed in bold type, and the captions or headlines of the several subsections of this Code which are printed in italics or otherwise, are intended as mere catchwords to indicate the contents of the sections and subsections. They are not to be deemed or taken as titles of the sections and subsections, or as any part thereof; and, unless expressly so provided, they shall not be so deemed or taken when any of such sections and subsections, including the captions or headlines, are amended or reenacted.

*Id. See also Montgomery County v. Eli,* 20 Md.App. 269, 275, 315 A.2d 136 (1974) ("Quite obviously such headings are not the words of the legislature and cannot be read to inject an intent not expressed in the body of the law.").

In light of the foregoing, we read the language "any civil or criminal action" to mean "any action" and not simply a defamation action. C.J.P. § 5–501 closely tracks the legislative privilege provided in Article III, Section 18: "No Senator or Delegate shall be liable in any civil action, or criminal prosecution, whatever, for words spoken in debate." That it was originally enacted, with the express purpose of shielding a

local official against liability for words spoken in debate, shortly after our decision in *Blondes, supra,* is a strong indication that the Legislature intended that local legislators enjoy the same protection as State legislators for legislative conduct. The purpose of relieving such officials from the burden of having to defend their legislative actions is served by the above interpretation and is perfectly consistent with this Court's prior explications of the common law legislative privilege.

Finally, our reading of C.J.P. § 5–501, in our view, creates no conflict with Article III, Section 50 of the Maryland Constitution because, if construed consistently with the State legislative privilege, it would only provide immunity from prosecution based on their legislative conduct, which also renders inadmissible evidence of such conduct to prove the criminal offense. It does not immunize local legislators from prosecution for bribery or any other offense. This is perfectly consistent with our previous decision in *Blondes,* wherein we stated:

> Our holding today insures the degree of separation of powers inherent in our form of government (*see Fletcher v. Peck,* 10 U.S. 87 [6 Cranch 87, 3 L.Ed. 162 (1810) ] ) by dispensing with the impropriety of executive or judicial inquiry into the motives of legislators. But nothing in our holding in any way derogates the egregious nature of bribery by a member of the Legislature nor suggests that it go unpunished. The Legislature has the power to keep its own house in order, Maryland Constitution, Article III, Sections 19 and 26, and the courts may still act under Article 27, Section 23 if the prosecution can prove its case without inquiry into legislative acts. The closing provision of Article 27, Section 23 providing for compellable testimony, interpreted as a grant of wide immunity in *Brown v. State, supra,* should facilitate any necessary court prosecutions without impingement on the legislative privilege. Since the trial judge erred in relying upon substantive evidence of Blondes's legislative acts, we shall order a new trial purged

of references to legislative acts prohibited by the legislative privilege.

16 Md.App. at 183–84, 294 A.2d 661.

Accordingly, we also hold that appellee enjoyed the protection provided by C.J.P. § 5–501 and, thus, the indictment was properly dismissed.

## IV

The State does not dispute that the acts alleged in the indictment constitute legislative acts. We read the State's failure to challenge whether appellee's actions constitute "legislative acts" as a concession that the acts fall within the privilege; thus, we express no opinion in the matter. Accordingly, we affirm.

## CONCLUSION

To recapitulate and provide, contextually, amplification of the rationale which impels the result herein, as we have stressed, *supra,* members of legislative bodies—whether Congress, State legislatures or local councils—may be prosecuted for criminal behavior, including offenses such as bribery, misfeasance in office and criminal corruption. These legislators have no general immunity from criminal prosecution. Under what are often referred to as the "speech and debate" clauses in the Federal Constitution (Art. I, § 6) and the Maryland Constitution (Md. Decl. Of Rts. Art. 10 and Art. III, § 18), there is a caveat to that principle, however. Members of those bodies generally may not be compelled to answer for or defend, in a non-legislative governmental forum, what they say or do in the legislative process. C.J.P. § 5–501 provides the same level of protection to members of local legislative bodies. With one exception, the case law is clear that both the Federal and the Maryland speech and debate provisions and, as we now hold, C.J.P. § 5–501, provide a limited form of privilege or immunity in both civil and criminal proceedings *United States v. Johnson,* 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966); *Montgomery County v. Schooley,* 97

Md.App. 107, 627 A.2d 69 (1993) (*Schooley*); *Manders v. Brown*, 101 Md.App. 191, 643 A.2d 931 (1994) (*Manders*).[9] The one exception is that, because of the supremacy clause in the Federal Constitution, State and local legislators, even if enjoying that protection under State law, do not enjoy it as a defense to Federal criminal prosecutions. *United States v. Gillock*, 445 U.S. 360, 100 S.Ct. 1185, 63 L.Ed.2d 454 (1980). It is clear, however, that members of the General Assembly, and by statute, local legislators, are not subject to civil liability or criminal prosecution in any State court for their legislative speech or conduct.

Although C.J.P. § 5–501 provides a clear statutory basis for affirming the judgment of the circuit court, because the issue was raised and argued in the context of the common law, we have addressed that as well. Neither of the Constitutional speech and debate provisions apply to members of local legislative bodies. The Federal provision applies only to members of Congress, and the Maryland provisions apply only to members of the General Assembly. *United States v. Gillock, supra; Schooley, supra.* Although the Court of Appeals has never ruled whether members of local legislative bodies have any comparable privilege or immunity, this Court has twice determined that they do, in civil cases. In *Schooley* and *Manders*, this Court concluded that local legislators have a *common law* public official privilege or immunity from having to answer, in a civil case, for what they have said or done in legislative sessions. In *Schooley*, this Court made clear that, *in civil cases*, that common law privilege or immunity is coextensive with the protection afforded members of the General Assembly under the Maryland Constitution. Until such

9. When the Constitutional provision has been raised in support of an objection to evidence of legislative activity, it has sometimes expressed as an evidentiary privilege, precluding the admission of evidence of legislative conduct, but it would seem to be broader than a mere evidentiary privilege, as it applies to both Executive and Judicial proceedings. Whether one characterizes it as a privilege or an immunity, for purposes of this case, is unimportant.

time as the Court of Appeals rules on that issue, that is the prevailing common law in Maryland.

Neither the Court of Appeals nor this Court has ever determined whether the common law privilege or immunity enjoyed by local legislators applies to *criminal* proceedings— whether they may be called upon to explain or defend their legislative conduct in a criminal prosecution. That is an open question in Maryland. There is no precedent on that issue, which is the one now before us.

We have set forth the positions of the parties and discussed the case law around the country with regard to that issue. The proper resolution of the issue requires us to consider the purpose of the common law protection which, as this Court makes clear in *Schooley,* is consonant with the purposes of the Constitutional speech and debate provisions.

Two interrelated purposes have been identified: protection and implementation of the separation of powers principle implicit in the Federal Constitution and explicit in the Maryland Constitution (*see* Md. Decl. Of Rts. Art. 8); and preservation of the independence of the legislative branch of the government. Although, to a large extent, the second purpose is subsumed in the first, we do not view it as entirely swallowed. As the State Prosecutor correctly points out, the State and the local subdivisions are not co-equal branches of the same government, so the Constitutional doctrine of separation of powers does not strictly apply, as it would between the Legislative, Executive and Judicial Branches of the State Government.

Ultimately, however, local legislative bodies are products of State law. They are authorized by the Maryland Constitution and the General Assembly. *See* Md. Constitution, Articles XI and XI–A with respect to Baltimore City and Charter Counties, Art. XI–E with respect to municipal corporations, and XI–F with respect to Code Counties, and Maryland Code, Articles 23A (municipal corporations), 25 (county commissioners), 25A (charter counties) and 25B (home rule counties). Undergirding the *raison d'etre* of the privilege or immunity at

issue is that the People of the State and the State itself, through duly enacted statutes, have authorized these local legislative bodies and have conferred upon them, within their respective geographic jurisdictions the same responsibility for debating and setting basic public policy that is vested in legislative bodies generally under a separation of powers modality. The need for legislative integrity and independence is thus as important in the local context, for the advantage of the citizens of the local community, as it is at the State level.

Given this context, we conclude that the privilege or immunity enjoyed by local legislators should be extended to criminal proceedings, as a matter of common law and C.J.P. § 5–501. Local legislators constitute the most direct form of representative democracy. They are the closest to the People and they often set the policies that most directly affect the health, safety and quality of life of the people residing in their communities. They must enjoy the same ability to speak and act in their legislative capacities, without fear of retribution, either criminally or civilly, because of what they say or how they vote. They may be called upon to answer for their legislative conduct to the citizens who elected them, which is what democracy is all about, but they may not be compelled to defend their legislative conduct to a prosecutor, to a grand jury or to a court. The record in this case shows that that is precisely what Ms. Holton was asked to do, and the circuit court was correct in not permitting it.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**